# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA



|  |  |
|---|---|
| SCOTT STEVENSON, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TYCO INTERNATIONAL LTD., EDWARD D. BREEN, DAVID J. FITZPATRICK, WILLIAM LYTTON, DENNIS C. BLAIR, GEORGE W. BUCKLEY, BRUCE S. GORDON, JOHN A. KROL, H. CARL MCCALL, MACKEY J. MCDONALD, BRENDAN R. O'NEILL, SANDRA S. WIJNBERG, JEROME B. YORK, LORD MICHAEL ASHCROFT, JOSHUA M. BERMAN, RICHARD S. BODMAN, JOHN F. FORT, III, STEVEN W. FOSS, WENDY E. LANE, JAMES S. PASMAN, W. PETER SLUSSER, and JOSEPH F. WELCH,<br><br>Defendants. | : Civil Action No.<br>:<br>: CLASS ACTION<br>: COMPLAINT<br>:<br>:<br>: JURY TRIAL DEMANDED<br>:<br><br>**05-80375**<br><br>CIV-HURLEY<br><br>J.HOPKINS |

Plaintiff, Scott Stevenson, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through his attorneys, which included, among other things, a review of the public documents and announcements made by the defendants, Securities and Exchange Commission ("SEC") filings, and press releases regarding Tyco International LTD ("Tyco"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## PRELIMINARY STATEMENT

1.    This is a class action brought by plaintiff on behalf of himself and a Class consisting of all other persons who sold Tyco common stock during the period from June 15, 2002 through and including December 31, 2004 (the "Class Period"), to recover damages caused by the defendants' violation of the federal securities laws.  The Complaint alleges that, during the Class Period, defendants issued and/or failed to correct false and misleading financial statements and press releases concerning Tyco's business prospects and operating results.

2.    After the appointment of Edward Breen to CEO on July 25, 2002, one of his first significant actions was the filing, on September 10, 2002, of a Form 8-K (the "September 2002 8-K"). The September 2002 Form 8-K resulted in the continuous and systematic deflation of Tyco's share price throughout the Class Period.  For instance, the Form 8-K announced that on April 30, 2002 Tyco retained Boies, Schiller & Flexner, LLP (the "Boies Firm"), and stated the purpose was to represent Tyco in negotiating the departure of CEO, Dennis Kozlowski. On June 3, 2002, Tyco announced that the Boies Firm was expanding its scope to include a full and complete review and analysis of transactions between and among Tyco and its subsidiaries and Tyco's officers and directors. This scope was again expanded, in June 2002, to include interviews of Tyco's officers and directors and review and analysis of data and documents. On June 17, 2002 Tyco filed civil complaints against its former lead director, Frank E. Walsh, and former general counsel, Mark A. Belnick alleging breach of fiduciary duty and other wrongful conduct. The Form 8-K concluded by announcing that Tyco was cooperating on an ongoing basis with investigations by the District Attorney of the County of New York and the Securities and Exchange Commission ("SEC").

3.    Unbeknownst to investors, Tyco's statements and reported financial results during the Class Period were materially false and misleading because they failed to disclose that:

2

a)      the former Board members and Defendant Breen had concluded that the best strategy to minimize the potential liability of the Board members and limit the potential monetary damages related to the current and anticipated shareholder complaints against Tyco was to assist the New York District Attorney in its quest to obtain a criminal conviction against former CEO Dennis Kozlowski;

b)      this course of action was designed to benefit the Board members and new management at the expense of current shareholders;

c)      this course of action would result in significant additional legal and consulting expenses that have been badly managed;

d)      this legal strategy was based upon hurried analyses, that were inadequate, misleading, deceptive, opportunistic, and unethical; or

e)      this tactic would result in significant additional shareholder dilution of value due to numerous cash and equity compensation packages freely given to new executives and Board members, as well as other friends of Defendant Breen, during a period when Tyco's share value was clearly below its normalized fair market value.

4.      On December 30, 2002, Defendants issued another Form 8-K (the "December 2002 8-K") that indicated that:

a)      There was no significant or systemic fraud in Tyco's financial statements;

b)      Although there were incorrect accounting entries and treatments that were required to be corrected, said entries and treatments were not material to Tyco's overall financial statements;

3

c)     Although Tyco's prior management engaged in accounting that was not the least conservative, said accounting was in accordance with Generally Accepted Accounting Principles ("GAAP"); and

d)     The reversal or restatement of prior management's accounting entries and treatments would not adversely affect Tyco's reported cash flow, reported revenue, or earnings for 2003 and thereafter.  See December 2002 8-K at 31.

## JURISDICTION AND VENUE

5.     The claims alleged herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

6.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78aa and 28 U.S.C. § 1331.

7.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in substantial part in this District. Moreover, being a Bermuda publicly-traded corporation, Tyco had a direct and significant U.S. corporate presence located in this district.

8.     In connection with the acts, transactions and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of the national securities exchanges.

## THE PARTIES

9.      Plaintiff sold and donated shares of Tyco common stock, as detailed in the attached certification, and has been damaged thereby.

10.     Defendant Tyco is a diversified manufacturing and service corporation, organized and existing under the laws of Bermuda, with an office located in Boca Raton, Florida. Tyco is a Bermuda corporation, and maintains its principal executive offices at 90 Pitts Bay Road, Pembroke HM 08, Bermuda. As of December 1, 2004, there were approximately 2,011,601,615 shares of Tyco's common stock issued and outstanding. Tyco's common stock trades on the New York Stock Exchange under the ticker symbol "TYC."

11.     Defendant Edward D. Breen ("Breen") has been Tyco's Chairman and Chief Executive Officer ("CEO") since July 2002.

12.     Defendant David J. Fitzpatrick ("Fitzpatrick") has been Tyco's Chief Financial Officer ("CFO") and an Executive Vice President since September 2002.

13.     Defendant William Lytton ("Lytton") has been Tyco's General Counsel ("GC") and an Executive Vice President since September 2002.

14.     Defendant Dennis C. Blair ("Blair") has been a member of Tyco's Board of Directors since March 2003.

15.     Defendant George W. Buckley ("Buckley") has been a member of Tyco's Board of Directors since December 2002.

16.     Defendant Bruce S. Gordon ("Gordon") has been a member of Tyco's Board of Directors since January 2003.

17.     Defendant John A. Krol ("Krol") has been a member of Tyco's Board of Directors since August 2002.

18.     Defendant H. Carl McCall ("McCall") has been a member of Tyco's Board of Directors since March 2003.

19.     Defendant Mackey J. McDonald ("McDonald") has been a member of Tyco's Board of Directors since November 2002.

20.     Defendant Brendan R. O'Neill ("O'Neill") has been a member of Tyco's Board of Directors since March 2003.

21.     Defendant Sandra S. Wijnberg ("Wijnberg") has been a member of Tyco's Board of Directors since March 2003.

22.     Defendant Jerome B. York ("York") has been a member of Tyco's Board of Directors since November 2002.

23.     Defendant Brian Duperreault ("Duperreault") has been a member of Tyco's Board of Directors since March 2004.

24.     Defendant Lord Michael Ashcroft ("Ashcroft") served as a member of Tyco's Board of Directors from the beginning of the relevant period until about November 2002.

25.     Defendant Joshua M. Berman ("Berman") served as a member of Tyco's Board of Directors from the beginning of the relevant period until about December 2002.

26.     Defendant Richard S. Bodman ("Bodman") served as a member of Tyco's Board of Directors from the beginning of the relevant period until about March 2003.

27.     Defendant John F. Fort, III ("Fort") served as a member of Tyco's Board of Directors from the beginning of the relevant period until about March 2003.

28.     Defendant Steven W. Foss ("Foss") served as a member of Tyco's Board of Directors from the beginning of the relevant period until about March 2003.

29.     Defendant Wendy E. Lane ("Lane") served as a member of Tyco's Board of Directors from the beginning of the relevant period until about March 2003.

30.     Defendant James S. Pasman ("Pasman") served as a member of Tyco's Board of Directors from the beginning of the relevant period until about November 2002.

31.     Defendant W. Peter Slusser ("Slusser") served as a member of Tyco's Board of Directors from the beginning of the relevant period until about March 2003.

32.     Defendant Joseph F. Welch ("Welch") served as a member of Tyco's Board of Directors from the beginning of the relevant period until about December 2002.

33.     Defendants Breen, Fitzpatrick, Lytton, Blair, Buckley, Gordon, Krol, McCall, McDonald, O'Neill, Wijnberg, York, Duppereault, Ashcroft, Berman, Bodman, Fort, Foss, Lane, Pasman, Slusser, and Welch are collectively referred to herein as the "Individual Defendants."

34.     By reason of their positions within Tyco, the Individual Defendants had access to internal documents, reports and other information, including non-public information concerning Tyco's business and financial condition, and attended management and/or board of director meetings.  As a result of the foregoing, they were responsible for the truthfulness and accuracy of Tyco's public reports and releases described herein.

35.     Defendants had a duty to disseminate promptly truthful and accurate information with respect to Tyco, and to correct any public filings or statements issued by or on behalf of Tyco that became false or misleading.

36.     Each of the Defendants knew, or recklessly disregarded, that the false and/or misleading statements and omissions complained of herein would adversely affect the integrity of the market for Tyco's stock, and would cause the price of Tyco's common stock to become

artificially deflated.  Each of the Defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiff and the other members of the Class.

37.     Defendants are liable, jointly and severally, as direct participants in, and co-conspirators of, the wrongs complained of herein.  The Individual Defendants, because of their positions with Tyco, were provided with copies of the Tyco reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public statements detailed herein and is therefore primarily liable for the representations contained therein.

## NO STATUTORY SAFE HARBOR

38.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint because none of the statements pleaded herein are "forward-looking" statements, nor were they identified as "forward-looking statements" when made. Nor did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in any purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor does apply to any statements pleaded herein that are deemed to be forward-looking, the Defendants are liable for those false forward-looking statements because, at the time each of those statements was made, the speaker actually knew those forward-looking statement were false and/or the statement was authorized and/or approved by an executive officer of Tyco who actually knew that the statements were false when made.

8

## SUBSTANTIVE ALLEGATIONS

A.   **Background**

39.   Tyco is a diversified manufacturing and service company that, through its subsidiaries: designs, manufactures, installs, monitors and services electronic security and fire protection systems; designs, manufactures and distributes electrical and electronic components; designs, manufactures and distributes medical devices and supplies, imaging agents, pharmaceuticals, adult incontinence and infant care products; designs, manufactures, distributes and services engineered products, including industrial valves and controls as well as steel tubular goods, and provides environmental and other industrial consulting services; and designs, manufactures and distributes plastic products, adhesives and films.

40.   In the ten-year period prior to 2002, primarily due to the aggressive expansion plans of Chairman and Chief Executive Officer Dennis Kozlowski ("Kozlowski"), as well as Executive Vice President and Chief Financial Officer Mark H. Swartz ("Swartz"), Tyco grew from approximately $1.2 Billion in sales to approximately $40 Billion in sales. Tyco was constantly growing. In fact, during the height of its acquisition spree, it averaged more than two acquisitions per week. This pace continued for years.

41.   In 2001, however, a number of dynamics began occurring that dealt significant blows to Tyco, including:

a)   Tyco forged ahead with a vertical integration strategy related to its telecom business. Instead of just being a telecom service and product provider, it became an owner of telecom lines. Then, the telecom industry crashed;

b)   Tyco purchased CIT and, shortly thereafter, Tyco announced that it intended to split up Tyco's operations into 4-5 separate companies. This announcement

9

had a chilling affect on the debt markets, and cut off "cheap" money, which was the lifeline of CIT's business model;

c) Enron and WorldCom both collapsed, due largely to financial pyramid schemes and other corporate fraud. To make matters worse, on September 11, 2001, New York City witnessed one of the worst terrorist attacks in history. Just after, the United States' financial markets suffered severe losses; and

d) Kozlowski, whose name had been synonymous with growth and financial prosperity at Tyco, resigned on June 3, 2002, for personal reasons.

42. The aforementioned events exasperated the financial posture of Tyco due to its large amount of short-term debt. It was primarily Tyco's ability to draw down backup funding arrangements, as well as to sell CIT for cash, albeit for a large financial statement loss, that enabled it to survive a scenario that might have otherwise been fatal.

43. Tyco was named in several shareholder suits in a manner consistent with when a company experiences a significant decline in corporate earnings and share price. Although Tyco's share value had experienced significant declines by this time, Tyco's business operations would have been capable of proving the viability of its business models to the market.

44. Although management had caused very little actual damage to Tyco that could not have been deemed to be in the ordinary course of business for a large international corporation that had experienced several business cycles, Tyco's Board of Directors appears to have panicked at what was potentially the most critical moment in Tyco's history.

45. On April 30, 2002, the Corporate Governance and Nominating Committee of the Board of Directors of Tyco had retained the Boies Firm to represent Tyco in negotiating the departure of CEO, Dennis Kozlowski. On June 3, 2002, Tyco announced that the Boies Firm

was expanding its scope to include a full and complete review and analysis of transactions between and among Tyco and its subsidiaries and Tyco's officers and directors. Tyco expanded this scope once more in June 2002, to include interviews of Tyco's officers and directors and review and analysis of data and documents. On June 17, 2002 Tyco filed civil complaints against its former lead director, Frank E. Walsh, as well as former General Counsel, Mark A. Belnick alleging breach of fiduciary duty and other wrongful conduct.

46.    The strategy developed when the Boies Firm was retained was ill-conceived with respect to protecting the shareholders and was structured primarily to protect the Individual Defendants' risk exposure at the expense of the shareholders.

47.    Moreover, when they released the September 2002 8-K, the Individual Defendants released what is potentially the most damaging document ever voluntarily disclosed by a company in the history of Corporate America. The September 2002 8-K provided the basis for most shareholder claims currently pending, as well as being almost factually identical to the accusatory documents filed by the United States Securities and Exchange Commission ("SEC") and the New York County District Attorney's Office.

48.    The Individual Defendants should have maintained their composure and acted in their leadership roles to preserve the value of Tyco while investigating the potential wrongdoings. Although initial investigations uncovered what appeared to be irregularities to an uninformed or inexperienced layperson, the Individual Defendants should have understood enough about the basic value of Tyco's business operations to understand that it was capable of demanding a share price of at least $30-$35 due to its normalized sales, profits, and cash flow, regardless of who was its CEO.

**B.     Materially False and Misleading Statements
Disseminated During the Class Period**

49.     The Class Period commences on June 15, 2002.  On this date, Tyco began leaking recklessly negative information to the public through the press.   Shortly thereafter, one of Defendant Breen's first significant actions, after his appointment as CEO on July 25, 2002, was to release the September 2002 8-K.  The Individual Defendants used the September 2002 8-K to leak overly negative information to the public and to shift the public's focus to a few individuals to be sacrificed for the good of the Individual Defendants.

**C.     Reckless Activities to Further Depress Tyco's Share Price**

50.     In  addition  to  the  overly  negative  information  the  Individual  Defendants disseminated to the public, they continued activities to further depress Tyco's share price by granting Defendant Breen millions of options at grant prices that were determined at a time when Tyco's share price was at its lowest price in recent history, and also at a time when Corporate America was being so loudly and publicly criticized for its large executive pay packages.

51.     This  calculated  loss  of  shareholder  value  at  the  expense  of  the  current shareholders was a strategy the Individual Defendants continued because of Defendant Breen's desire to keep Tyco's share price artificially deflated while appointing more members of a new management team that could benefit from the low grant price related to stock options and other equity compensation.

52.     In order to continue the loss in shareholder value, the Individual Defendants became  overly  pessimistic  regarding  negative  information  reported  by  the  press  relating  to Tyco's financial and management conditions.  Moreover, the Individual Defendants cooperated

with the SEC by restating of prior periods' net income so that Tyco could later report increased net income in future years when the Individual Defendants' stock options matured.

53.     The Individual Defendants ignored that the public's negative perception of Tyco would have improved after Tyco's business model proved successful, Tyco's debt issue was corrected, and the financial markets rebounded from one of the worst declines in history.  At a time when Tyco shareholders most needed their interests addressed, everyone "in charge" was really only looking after his or her own interests.

**D.      Tyco's Misrepresentation of Kozlowski's Activities**

54.     Prior Board members had been extremely confident in entrusting Kozlowski and Swartz with complete authority regarding every aspect of Tyco's affairs, including the determination of their own compensation.   The Board merely provided a "rubber stamp" approval to every decision Dennis Kozlowski ever proposed.  The Board had complete access to any items it cared to pursue.  In fact, some Board members were very inquisitive about a number of corporate matters, while other Board members relied on each other's expertise.

55.     Regarding tax matters and financial statement disclosures, it was common to have a Board member perform detailed reviews of financial data, financial statement disclosures, and issues related to various corporate tax matters.   These same Board members would have numerous in-depth discussions with various Tyco personnel related to these matters.  The results of these efforts, as well as the conclusions and actions by the Board members, were never documented in formal Board minutes.

56.     It is misleading to portray that only those items that were formally approved by the Board in written Board minutes were authorized, and that every other action performed by corporate executives is void.   Almost every action taken by corporate executives was

accomplished before the Board formally met to discuss them, at which time the Board would "rubber stamp" each significant action deemed large enough to merit a formal approval. These significant items consisted of a small number of formal Board actions. Had the Individual Defendants conducted a thorough and honest review of the actual working relationships between the Tyco's Board of Directors and its executive management, they would have never reached such an erroneous conclusion in Tyco's internal investigation. However, reaching this erroneous conclusion and then allowing it to reach the public, played an important role in ensuring the Tyco's share price would remain artificially depressed.

57.    Individuals who were once great supporters of Kozlowski and Swartz, but crumbled when faced with fear and intimidation, spearheaded this action. Instead of remaining calm and determined, like Board members of companies facing genuine financial difficulties and the repercussions of fraudulent insiders, Tyco Board members demonstrated their total lack of understanding of Tyco's company dynamics and performed great disservices to former friends and colleagues, as well as to current shareholders to whom they owed a fiduciary duty.

58.    Tyco's entire strategy is based upon aiding in the criminal convictions of Kozlowski and Swartz, so that it can file civil suits against both for the same activities that formed the basis for their criminal convictions. In furtherance of that objective, Tyco provided the majority of the evidence being used in the criminal trials.

59.    Tyco's focus upon the past in order to achieve its goal of aiding in the convictions of Kozlowski and Swartz, as well as its attitude of arrogance, has been the primary cause of significant damage to share value by:

        a)    alienating former management, which has resulted in ongoing inefficiencies and legal disputes;

14

b)    its inability to manage legions of outside advisors that have cost its shareholders hundreds of millions of dollars;

c)    new management's ignorance of Tyco's underlying operating fundamentals and strengths that resulted in financial bonus targets that were easily exceeded, so that more bonuses were paid out than at anytime in Tyco's history;

d)    the continual degradation and neglect of the fundamentals of Tyco's tax structure, including alienating its former tax management group and outside tax advisors, as well as the failure of its current executive management and Board members to ensure that tax functions and legal strategies were adequately and competently managed; and

e)    the initial promise by current management that earnings per share would be reported net of special charges, yet earnings per share have been consistently discussed and reported before special charges.

### UNDISCLOSED ADVERSE FACTS

60.    The market for Tyco's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Tyco securities traded at artificially deflated prices during the Class Period.  Plaintiff and other members of the Class sold Tyco securities relying upon the integrity of the market price of Tyco securities and market information relating to Tyco, and have been damaged thereby.

61.    During the Class Period, defendants materially misled the investing public, thereby deflating the price of Tyco securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and

misleading in that they failed to disclose material adverse information and misrepresented the truth about Tyco, its business and operations, as alleged herein.

62.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Tyco's former management, business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically negative assessment of Tyco and its business, prospects and operations, thus causing Tyco's securities to be undervalued and artificially deflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class selling Tyco's securities at artificially deflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

63.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of Tyco were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Tyco, their control over, and/or receipt and/or modification of Tyco's allegedly materially misleading misstatements and/or their associations

16

with Tyco which made them privy to confidential proprietary information concerning Tyco, participated in the fraudulent scheme alleged herein.

64.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of Tyco, including the Individual Defendants.

65.     In fact, during the Class Period insiders purchased shares of Tyco and received options and restricted shares, later realizing significant profits.

66.     As a result of such improper conduct, Defendants violated the following Generally Accepted Accounting Principles "GAAP"), among others:

(a)     the principle that the financial information presented should be complete. (See APB No. 4, ¶¶ 28, 35, 88, 171);

(b)     the principle of fair presentation ("presents fairly").  (See APB No. 4, ¶¶ 109, 138, 189);

(c)     the principle of adequacy and fairness of disclosure.  (See APB No. 4, ¶¶ 81, 106, 189, 199);

(d)     the principle of materiality concerning information that is significant enough to affect evaluations or decisions. (See APB No. 4, ¶¶ 25, 128);

(e)     the principle that the financial statements contain and disclose relevant, understandable, and timely information for the economic decisions of the user. (See APB No. 4, ¶¶ 23, 88, 89, 92);

(f)    the principle that the financial statements provide reliable financial information about the enterprise for the economic decisions of the user. (See APB No. 4, ¶¶ 77, 78, 107, 108).

## CLASS ACTION ALLEGATIONS

67.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class") consisting of all persons who sold Tyco common stock during the Class Period. Excluded from the Class are the Defendants, any entity in which the Defendants have a controlling interest or is a parent or subsidiary of or is controlled by Tyco, and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns of the Defendants.

68.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes there are thousands of members of the Class who traded during the Class Period.

69.    Questions of law and fact are common to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the Defendants' acts, as alleged herein, violated the federal securities laws;

(b)    whether Tyco issued false and misleading financial statements during the Class Period;

(c)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(d)     whether the market prices of Tyco's securities during the Class Period were artificially deflated because of the Defendants' conduct complained of herein; and

(e)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

70.     Plaintiff's claims are typical of the claims of the members of the Class as plaintiff and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

71.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent in class actions and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

72.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy because joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them.  Plaintiff anticipates no unusual difficulties in the management of this action as a class action.

73.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud on the market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     such omissions and misrepresentations were material;

19

(c)     Tyco's common stock traded in an efficient market and its price was deflated artificially during the Class Period because of the Defendants' misrepresentations and omissions detailed herein;

(d)     the misrepresentations and omissions alleged induced a reasonable investor to misjudge the value of Tyco's securities; and

(e)     plaintiff and the other members of the Class sold Tyco stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

74.     Based upon the factors set forth in the preceding paragraph, plaintiff and the other members of the Class are entitled to the presumption of reliance upon the integrity of the market.

**COUNT I**
**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND**
**RULE 10b-5 BROUGHT AGAINST ALL DEFENDANTS**

75.     Plaintiff repeats and reiterates each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

76.     During the Class Period, defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon plaintiff and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the Class.  The purpose and effect of the scheme, plan, and unlawful course of conduct was, among other things, to deceive the investing public, including plaintiff and the

other members of the Class, and to induce plaintiff and the other members of the Class to sell Tyco common stock during the Class Period at artificially deflated prices.

77.     During the Class Period, Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and/or recklessly issued, caused to be issued, participated in the issuance of, the preparation and/or issuance of deceptive and materially false and misleading statements to the investing public as particularized above.

78.     As a result of Defendants' dissemination of and/or failure to correct the false and misleading statements set forth above, the market price of Tyco common stock was artificially deflated during the Class Period.  Unaware of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by Defendants, plaintiff and the other members of the Class relied, to their detriment, on the integrity of the market price of the stock in selling Tyco common stock.  Had plaintiff and the other members of the Class known the truth, they would not have sold Tyco shares at the deflated prices that they did.

79.     Plaintiff and the other members of the Class have suffered damages as a result of the wrongs herein alleged in an amount to be proved at trial.

80.     By reason of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, and are liable to plaintiff and the other members of the Class for damages which they suffered in connection with their sales of Tyco stock during the Class Period.

## COUNT II
## VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT

**BROUGHT AGAINST THE INDIVIDUAL DEFENDANTS**

81.     Plaintiff repeats and reiterates each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

82.     The Individual Defendants acted as controlling persons of Tyco under the meaning of section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and active participation in and/or awareness of Tyco's day-to-day operations, and/or intimate knowledge of Tyco's business plans and implementation thereof, each Individual Defendant had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Tyco, including the content and dissemination of the various statements that plaintiff alleges are false and misleading.  The Individual Defendants were provided with, or had unlimited access to copies of Tyco's reports, press releases, public filings and other statements alleged herein to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

83.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Tyco and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

84.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their sales of Tyco's securities during the Class Period.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

(a)     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)     Awarding plaintiff and the other members of the Class damages in an amount that may be proved at trial, together with interest thereon;

(c)     Awarding plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

(d)     Such other relief as this Court deems appropriate.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: April 29, 2005

Respectfully submitted,

By: _____
Adam H. Smith, Esq.
FL Bar No.: 964506

ADAM H. SMITH, P.A.
2650 North Military Trail, Suite 125
Boca Raton, Florida 33431
Phone: (561) 995-7788

Attorneys for Plaintiff

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Scott Stevenson

**05-80375**

## DEFENDANTS

Tyco International LTD, Edward Breen, David Fitzpatrick et al.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Palm Beach
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Bermuda
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) (Tel 561-995-7789)
Adam H. Smith, P.A.
2650 North Military Trail, Suite 125
Boca Raton, FL 33431

ATTORNEYS (IF KNOWN)  Unknown

CIV-HURLEY

**(d)** CIRCLE COUNTY WHICH ACTION AROSE:  DADE,  MONROE,  BROWARD,  PALM BEACH,  MARTIN,  ST. LUCIE,  INDIAN RIVER,  OKEECHOBEE  HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

9:05CV 80375-Hurley

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ | Foreign Nation | ☐ 6 | ☐ 6 |

HOPKINS

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med Malpractice | B☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | B☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | B☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☒ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B☐ 690 Other | **B SOCIAL SECURITY** | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **A LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | A☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A☐ 535 Death Penalty | A☐ 791 Empl. Ret. Inc Security Act | A☐ 871 IRS – Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | A☐ 550 Civil Rights | | | A OR B |
| | | B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Securities Exchange Act of 1934

LENGTH OF TRIAL
via____days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ Undetermined

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ YES  ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____  DOCKET NUMBER _____

DATE  4/29/2005

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT 533983  AMOUNT 257.00  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____